# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

No. 18-CV-1924

QUINTON RUBIN,

Petitioner,

VERSUS

JAMIE LAMANNA,

Respondent,

## MEMORANDUM AND ORDER
August 5, 2019

JOSEPH F. BIANCO, United States Circuit Judge (sitting by designation):

Quinton Rubin (hereinafter, "petitioner") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2554, challenging his conviction in New York State court. Petitioner was convicted on April 16, 2014 of murder in the second degree (N.Y. Penal Law ("Penal Law") § 125.25(1)) in the Supreme Court of New York Suffolk County, and was sentenced to twenty years to life in prison.

In the instant habeas petition, petitioner challenges his conviction on the following grounds: (1) petitioner's Fourteenth Amendment rights were violated under *Batson v. Kentucky*, 476 U.S. 79 (1986); (2) the trial court improvidently exercised its discretion when it permitted improper testimony by a witness for the prosecution; (3) petitioner's Fourth Amendment rights were violated when the prosecution allegedly introduced petitioner's phone records and cell site information into evidence without having first obtained a warrant or court order; (4) the verdict was against the weight of the evidence and the prosecution failed to prove its case beyond a reasonable doubt; and (5) petitioner's sentence was harsh and excessive. For the reasons discussed herein, petitioner's request for a writ of habeas corpus is denied in its entirety.

## I. BACKGROUND

### A. Factual Background

The following facts are adduced from the underlying record and the instant petition.

#### 1. The Evidence

On November 12, 2012, petitioner spent the day with his eleven-year old son "J." (T.

87.)[1] J is petitioner's child with his estranged wife, Melissa Oyola ("Oyola"). (T. 79.) J lives with Oyola and his sister. (*Id.*) Petitioner was not living with Oyola on the date in question, as petitioner had moved out on August 29, 2012. (T. 104.) Petitioner and Oyola had a history of domestic violence, including an incident where Oyola stabbed petitioner. (T. 144.)

On the dates at issue, November 12 and 13 of 2012, petitioner and Oyola were married, but were separated. (T. 103.) At that time, Oyola and another man, Sean Berry ("Berry"), had been dating since May of 2012. (T. 104.) Berry and petitioner knew each other and called each other "cousins." (T. 105.) In her testimony at trial, Oyola admitted to having sexual relations with Berry while she and petitioner were still living together. (T. 164.)

Early in the morning, on November 13, 2012, J woke up ill. (T. 80-81.) He looked for his mother, but she was not in the house and had left her phone on the dining room table. (T. 81.) J then called petitioner to ask whether he knew where his mother was. (T. 82.) During the phone call, J told petitioner that Berry had come over to the house. (T. 82.) After this phone call, J returned to bed. (T. 83.)

At or around 4:30 a.m. on November 13, 2012, Oyola was with Berry in a trailer in the driveway of Oyola's house. (T. 107.) At that time, petitioner knocked on the window to the trailer. (T. 105-108.) After the third knock, Berry instructed Oyola to open the door because he thought it was the children knocking. (T. 109.) Once inside, petitioner wielded a gun and shot Berry in the face. (T. 111.) Petitioner then shot Berry several more times at close range before he ran out of the trailer and onto the street. (T. 112.) Oyola

observed petitioner run down the driveway and onto the street, and Oyola then went into the house to check on her children, and called the police. (T. 113.) Oyola told the 911 operator that the perpetrator was her husband. (T. 117.) Officer Coyne arrived on the scene and found Berry dead on the bed. (T. 45.) Berry had bled heavily and had severe trauma to his face and chest. (T. 46.) Officer Coyne recovered a dark mask with a skull on it at the end of the driveway. (T. 47.) Oyola identified the assailant as the petitioner to Officer Coyne. (T. 46.)

That same morning, petitioner contacted his attorney to explain that "something was going on, that he might be involved." (T. 563.) The attorney instructed petitioner and his girlfriend to come to his office between the hours of 1:00 p.m. and 2:00 p.m. that afternoon. (*Id.*) Petitioner drove to the parking lot of the attorney's office, and upon exiting his automobile, was taken into custody by the police. (*Id.*)

2. Trial

Petitioner was tried by a jury in Supreme Court, Suffolk County. The Court will summarize the portions of the trial relevant to petitioner's claims.

a. Jury Selection

During jury selection, the following exchanges took place between a prospective juror and the attorneys, Mr. Kutzrock for the People and Mr. Besso for defendant:

> MR. KURTZROCK: You know what, in all of our lives we have to – we hear people tell us things. So sometimes if they're in positions of authority, those of us with kids, especially if there's two kids, you know, there's gonna be times when

---

[1] Citations to "T." are references to the transcript of petitioner's March 2014 jury trial. (ECF Nos. 8-14 to 8-17.) The Court uses the pagination noted on the trial transcript.

someone says well, you know, he pulled my hair; oh, no, but she, you know, hit me with a whiffle ball bat and you have to make a decision. Do you think you would be able to do that . . . , if you get picked as a juror?

PROSPECTIVE JUROR: Are you going back to the red light or green light?

(JS. 14.)[2]

Later, the prospective juror gave uncertain answers to defense attorney Mr. Besso's voir dire:

MR. BESSO: Okay . . . do you believe that the truth can come in many types of shades or it can be distorted or misunderstood?

PROSPECTIVE JUROR: Could you repeat the question?

MR. BESSO: Do you believe that the truth could come in many types of shades of the truth or could be distorted or misunderstood by the person that's perceiving what that fact or that truth is?

PROSPECTIVE JUROR: Could be, could be.

MR. BESSO: Do you believe it could be misinterpreted?

PROSPECTIVE JUROR: Might be.

(JS. 62-63.)

*   *   *

MR. BESSO: . . . [H]ow about yourself, if [the defendant] didn't testify does that signal to you he must have done something?

PROSPECTIVE JUROR: No, but it's his attorney's doing.

MR. BESSO: Well, he and I together.

PROSPECTIVE JUROR: Oh.

MR. BESSO: We're as one person.

PROSPECTIVE JUROR: Oh.

MR. BESSO: You understand I'm his attorney, right?

PROSPECTIVE JUROR: Okay. No, yes right.

MR. BESSO: But he and I are like one person right now.

(JS. at 73-74).

The prosecutor ultimately exercised a peremptory challenge against the prospective juror, an African-American female. (JS. 84.) Defense counsel raised an objection, stating that "[i]t's the only person of color in the whole audience that was left, and she didn't say anything that I feel would be, you know, for cause. I know [the prosecutor] doesn't have to give a reason, but I would just want to make sure." (JS. 84-85. ) The trial court construed defense counsel's comment as a possible challenge pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), and noted that,

---

[2] Citations to "JS." are references to the February 27, 2014 transcript of the jury selection for petitioner's trial. The Court uses the pagination noted on the jury selection transcript.

"for a *Batson* objection you have to show a pattern," and then indicated to the prosecutor that "it's up to you whether or not you want to address that." (JS. 85.) After a discussion with the trial court judge as to whether in fact the prospective juror was African-American, the prosecutor then stated that the reasoning behind his peremptory strike was that "[s]ome of the answers that she gave today seemed a little confused at times . . . ." (JS. 86.) The prosecutor also noted that the prospective juror had given "hesitant" and difficult to understand answers on the previous day of jury selection. (*Id.*) The trial court agreed with the prosecutor's non-discriminatory reasoning, and stated "if what you're offering is a *Batson* challenge, it's denied." (JS. 87.) Defense counsel did not object, and replied, "[a]ll right, Judge." (*Id.*)

b. Presentation of Evidence

The prosecution called numerous witnesses to the stand, including petitioner's estranged wife (Oyola) and son (J), custodian of records for MetroPCS (Kenneth LeCesne), a forensic scientist in the firearms ballistics unit at the Suffolk County Crime Laboratory (Roy Sineo), the detective from the Suffolk County Police Department who executed the search warrant in connection with the underlying criminal case (Detective Michael Mahan) (T. 20, 78, 82, 470), and the deputy medical examiner of the Suffolk County Medical Examiner's Office (Dr. Stephanie Horowitz) (T2., ECF No. 18-8, at 20).[3]

At trial, the evidence demonstrated that when police executed a search warrant at petitioner's residence on November 14, 2012, they found a .357 Winchester cartridge and two .38 Special Winchester shell casings. (T. 371, 373.) Trial testimony revealed that

Berry died from gunshot wounds to the torso, and the five bullets were removed from Berry's body by a medical examiner and were examined by a forensics ballistics expert with the Suffolk County Crime Laboratory. (T2. 20; T. 252.) It was determined that all five bullets were fired from the same gun, and were consistent with a revolver-type ammunition. (T. 466.) At trial, a forensic scientist from the Suffolk County Crime Laboratory testified that a .357 revolver could shoot the type of bullets that killed Berry and could also shoot the type of ammunition found in petitioner's apartment. (T. 470.)

Additionally, Oyola, an eye-witness to the incident, testified that she immediately recognized the shooter as petitioner, and could see his eyes and recognize his voice despite the fact that the lower part of his face was covered by a mask. (T. 113-16, 129). Oyola testified that she witnessed the petitioner shooting Berry from a distance of about four feet, and then observed petitioner shoot four additional shots at Berry from a distance of about two feet. (T. 110, 210; *see* T.2. 13-14). Through testimony from J, it was revealed that the mask worn by the shooter, that was found on the street near where the shooter fled, was similar to the mask that petitioner wore when he went quad riding. (T. 84-85.)

Further, the testimony revealed that the police obtained records of petitioner's cell-site information from MetroPCS. (T. 299.) Cell-site information consists of a detailed record of phone logs with cell tower information, that can be used to determine the proximity and location of a cell phone in relation to particular cell tower at a particular time. (T. 299.) At trial, the prosecution

---

[3] Citations to "T2." are references to the March 11, 2014 transcript from petitioner's trial. This segment of the transcript was filed separately from the rest of the trial transcript, and has its own pagination.

called Kenneth LeCesne, a custodian of records for MetroPCS, to give testimony as to the location of petitioner's cell phone throughout the day on November 13, 2012. (T. 297.) Through this testimony, it was revealed that at 3:15 a.m. on November 13, 2012, petitioner received a call from J's cell phone. (T. 337.) The call lasted five minutes and was transmitted by tower 875, sector 2. (T. 337.) Tower 875 sector 2 was located eight-tenths of a mile from petitioner's residence. (T. 409, 410.) At 3:20 a.m., petitioner called his son, but the call went unanswered; the same tower 875 sector 2 transmitted that call. (T. 337-38). Petitioner then called Oyola's cell phone at 3:22 a.m., using the code *67 to block his phone number from the receiver. (T. 338-39.) The call lasted 74 seconds and was also transmitted by tower 875 sector 2. (T. 339.) At 4:22 a.m., petitioner called J, and the call was transmitted by tower 878 sector 3 located in Bay Shore on Bay Avenue, approximately six-tenths of a mile from Oyola's house. (T. 339-40, 411.) The call was answered and lasted 36 seconds. (T. 339.)

The last call from petitioner to his son occurred at 4:23 a.m. and began at tower 509 sector 1 and ended at tower 878 sector 4, indicating movement by petitioner during the time of the call. (T. 340, 412.) Tower 509 sector 1 and Tower 878 sector 4 were located 1.4 miles and six-tenths of a mile from Oyola's house, respectively. This testimony and the records from petitioner's cell phone provider and cell towers placed petitioner's cell phone at an area less than one mile from Oyola's residence right before the crime occurred around 4:30 a.m. (T. 410-11.)

c. Verdict and Sentence

At trial, a jury found petitioner guilty of murder in the second degree in violation of Penal Law § 125.25(1). He was sentenced by

the New York Supreme Court in Suffolk County to twenty years to life in prison on April 16, 2014.

B. Procedural History

1. Direct Appeal

Petitioner appealed to the Second Department of the New York State Appellate Division. On direct appeal, petitioner argued that: (1) the trial court erroneously decided defense counsel's *Batson* challenge; (2) the court erroneously permitted a records custodian to testify about technical aspects of cell phone towers and the contents of petitioner's cell phone records; (3) the prosecution obtained petitioner's cell phone records and cell site information without a court order, in violation of his Fourth Amendment rights; (4) the prosecution failed to prove appellant guilty of murder in the second degree beyond a reasonable doubt and his conviction was against the weight of the evidence; and (5) petitioner's sentence of 20 years to life incarceration was harsh and excessive. On October 12, 2016, the Second Department affirmed the trial court's judgment of conviction and sentence. *People v. Rubin*, 39 N.Y.S.3d 74 (2nd Dep't 2016).

On February 9, 2016, respondent made a motion to enlarge the court record to include an order pursuant to the Stored Communications Act, 18 U.S.C. 2703, signed by Justice Condon on January 22, 2013, for MetroPCS cell phone records from November 12 through November 13 of 2012 for petitioner and petitioner's girlfriend. (Resp. Opp., Ex. 25, ECF No. 8-25.) The Second Department granted the motion to expand the record on March 29, 2016. (Resp. Opp., Ex. 26, ECF No. 8-26.)

On appellate review, the Second Department concluded that petitioner's *Batson* challenge was "unpreserved for appellate review" because he did not object

to the trial court's acceptance of the prosecutor's facially race-neutral explanation for striking the prospective juror. *Rubin*, 39 N.Y.S.3d at 76. The court concluded that, "[i]n any event, there is no basis to disturb the County Court's determination that the race-neutral explanation provided by the prosecutor for striking the juror was not pretextual." *Id.* Moreover, the "defendant's additional claim that his cell phone records were improperly admitted" was also unpreserved for appellate review. *Id.* at 847. The court held that, "[i]n any event, contrary to the defendant's contention, the record demonstrates that the prosecution properly obtained his cell phone records by court order issued pursuant to the Stored Communications Act . . . ." *Id.* (internal citations omitted).

The Second Department also concluded that the lower court properly permitted the records custodian to testify regarding the movements of the defendant's phone. The court determined that "the challenged testimony, which was based on records showing the proximity of the phone to particular cell phone towers, was within the record custodian's knowledge and experience." *Id.* (citing *People v. Paige*, 891 N.Y.S.2d 374, 376 (1st Dep't 2009)).

As to the weight of the evidence challenge, the Second Department found that the evidence "was legally sufficient to establish the defendant's guilt beyond a reasonable doubt" after reviewing it in the light most favorable to the prosecution. *Id.* Indeed, after conducting an independent review of the weight of the evidence and reviewing the record itself, the appellate court was "satisfied that the verdict of guilt

was not against the weight of evidence." *Id.* Finally, the Second Department held that "the sentence imposed was not excessive." *Id.*

Petitioner requested leave to appeal to the New York State Court of Appeals, and the request was denied on December 27, 2016. *See People v. Rubin*, 28 N.Y.3d 1126 (N.Y. 2016).

2. The Instant Petition

On March 19, 2018, petitioner filed a timely petition before this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. (ECF No. 1.) Petitioner raises the same five challenges in the instant action as he did in his appeal to the Second Department. Namely, petitioner challenges his conviction on the following grounds: (1) the prosecutor's reason for exercising his peremptory strike to excuse a prospective juror was a pretext for discrimination and therefore violated petitioner's *Batson* rights; (2) the trial court improvidently exercised its discretion when it permitted improper technical testimony by the prosecution's witness, a custodian of cell phone records; (3) petitioner's Fourth Amendment rights were violated when the prosecution introduced into evidence the petitioner's phone records and cell site information without having first obtained a warrant or court order to obtain these records; (4) the prosecution failed to prove petitioner was guilty of murder beyond a reasonable doubt and the verdict was against the weight of evidence; and (5) his sentence was harsh and excessive. (Pet.) The People filed a response to the petition on August 6, 2018. (Resp. Opp., ECF No. 8.) Petitioner did not file a reply.[4] The Court has

---

[4] This Court issued an Order on May 3, 2019 noting that petitioner had indicated in his petition that he may be attempting to file a Section 440 motion, and instructing petitioner to file a letter with the Court by May 24, 2019 indicating whether or not he had filed

such a motion. (ECF No. 9.) The Order instructed petitioner that, if he did not file a letter, the petition would be decided based on the current record. (*Id.*) To date, petitioner has not filed a letter or otherwise

fully considered the parties' submissions, as well as the underlying record.

## II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved and unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented by the State court proceedings.

28 U.S.C §2254. "'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413 (2000). A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principles from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.*

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decisions applied clearly established federal law erroneously or incorrectly. Rather the application must be *unreasonable*." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411) (emphasis added). The Second Circuit added that, while "[s]ome increment of incorrectness beyond error is required…the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## III. DISCUSSION

Petitioner argues that he is entitled to habeas relief on the grounds that: (1) the

---

communicated with the Court regarding the instant petition.

prosecutor's explanation for exercising his peremptory strike to excuse a prospective juror was a pretext for discrimination and therefore violated petitioner's *Batson* rights; (2) the trial court improvidently exercised its discretion when it permitted improper technical testimony by the prosecution's witness, a custodian of cell phone records; (3) petitioner's Fourth Amendment rights were violated when the prosecution introduced into evidence the petitioner's phone records and cell site information without having first obtained a warrant or court order to obtain these records; (4) the prosecution failed to prove petitioner was guilty of murder beyond a reasonable doubt and the verdict was against the weight of evidence; and (5) his sentence was harsh and excessive.

For the reasons set forth below, petitioner's request for a writ of habeas corpus is denied in its entirety. Specifically, the Court concludes that petitioner's claims relating to the *Batson* challenge and the violation of the Stored Communications Act are procedurally barred from habeas review. Moreover, the Court concludes that all of petitioner's claims, including the procedurally barred claims, are without merit.

A. Procedural Bar

1. Independent and Adequate State Ground

A petitioner's federal claims may be procedurally barred from habeas review if they were decided at the state level on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729-33 (1991); *see, e.g.*, *Michigan v. Long*, 463 U.S. 1032, 1041 (1983). The procedural rule at issue is adequate if it is "firmly established and regularly followed by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (internal quotation

marks omitted). To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case," by "clearly and expressly stat[ing] that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 261-63 (1989) (internal quotation marks omitted). In addition, a state court's reliance on an independent and adequate procedural bar precludes habeas review even if the state court also rejected the claim on the merits in the alternative. *See, e.g.*, *id.* at 264 n.10 (holding that "a state court need not fear reaching the merits of a federal claim in an *alternative* holding," so long as the state court "explicitly invokes a state procedural bar rule as a separate basis for decision"); *Glenn v. Bartlett*, 98 F.3d 721, 725 (2d Cir. 1996) (same).

The procedural bar is based on the "comity and respect" that state judgments must be accorded. *House v. Bell*, 547 U.S. 518, 536 (2006). Its purpose is to maintain the delicate balance of federalism by retaining a state's rights to enforce its laws and to maintain its judicial procedures as it sees fit. *Coleman*, 501 U.S. at 730-31. Generally, the Second Circuit has deferred to state findings of procedural default as long as they are supported by a "fair and substantial basis" in state law. *Garcia*, 188 F.3d at 78. However, there is a "small category" of "exceptional cases in which [an] exorbitant application of a generally sound [procedural] rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376, 381 (2002). Nevertheless, principles of comity "counsel that a federal court that deems a state procedural rule inadequate should not reach that conclusion lightly or without clear support in state law." *Garcia*, 188 F.3d at 77 (citation and internal quotation marks omitted).

If a claim is procedurally barred, a federal habeas court may not review it on the merits unless the petitioner demonstrates both cause for the default and prejudice resulting therefrom, or if he demonstrates that the failure to consider the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 750. A petitioner may demonstrate cause by showing one of the following: "(1) the factual or legal basis for a petitioner's claim was not reasonably available to counsel, (2) some interference by state officials made compliance with the procedural rule impracticable, or (3) the procedural default was the result of ineffective assistance of counsel." *McLeod v. Graham*, No. 10 Civ. 3778, 2010 WL 5125317, at *3 (E.D.N.Y Dec. 9, 2010) (citing *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994)). Prejudice can be demonstrated by showing that the error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003) (citation and internal quotation marks omitted). A miscarriage of justice is demonstrated in extraordinary cases, such as where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To overcome a procedural default based on a miscarriage of justice, the petitioner must demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536-38 (2006).

## 2. Application to Petitioner's Claim for *Batson* Violations

The Court concludes that petitioner's claim regarding the *Batson* challenge is procedurally barred because this claim was decided at the state level on adequate and independent state procedural grounds.

Failing to preserve a *Batson* challenge for appeal "constitutes an independent and adequate state ground" which precludes a habeas court from further consideration of the claim. *Rodriguez v. Schriver*, 392 F.3d 505, 510 (2d Cir. 2004); *see also Galarza v. Keane*, 252 F.3d 630, 638 (2d Cir. 2001) ("[A] party must raise his or her *Batson* challenges in a manner that would allow a trial court to remedy the problem at trial"). Here, the Appellate Division expressly held that petitioner's failure to "object to the County Court's acceptance of the prosecutor's explanation" and his failure to "articulate any reason why he believed that the explanation was pretextual," rendered "his present contention that the prosecutor's explanation was pretextual . . . unpreserved for appellate review." *Rubin*, 39 N.Y.S.3d at 75; *see also People v. Figueroa*, 714 N.Y.S.2d 241, 242 (2nd Dep't 2000) ("The defendant's contentions on appeal with respect to the explanations offered are unpreserved for appellate review, since the defendant did not address the merits of the prosecution's facially-neutral explanations at trial.") Petitioner thus failed to preserve the issue for appeal to this Court on a habeas petition.

In addition, petitioner has not demonstrated cause for, or actual prejudice resulting from, the default. First, he has offered no explanation for why he failed to preserve his objection with respect to the *Batson* challenge at trial, and thus has not shown "cause" for the procedural default. Second, he has not shown prejudice because, as discussed below, each of these claims fails on the merits and the evidence of his guilt was overwhelming. *See Torres v. Senkowski*, 316 F.3d 147, 152 (2d Cir. 2003); *McLeod*, 2010 WL 5125317, at *3; *People v. Hudgins*, No. 07–CV–01862–(JFB), 2009 WL 1703266, at *6 (E.D.N.Y. June 18, 2009). Petitioner has also failed to show this case would result in a miscarriage of justice if the

Court failed to review the claims on the merits. Thus, this claim is procedurally barred.

However, in an abundance of caution, the Court reviews the merits of petitioner's *Batson* challenge below, and finds the claims to be without merit.

### 3. Application to Petitioner's Claim for Violations of the Stored Communications Act

Petitioner claims that his Fourth Amendment rights were violated when the prosecution introduced his cell phone records into evidence without having obtained a warrant or court order. Petitioner's claim for violations of his Fourth Amendment rights because of noncompliance with the Stored Communications Act claim is procedurally barred from habeas corpus review since it was decided at the state level on adequate and independent procedural grounds.

As discussed *supra,* petitioner appealed his conviction to the Appellate Division on five grounds, one of which was that his cell phone records were improperly admitted because they were obtained in violation of the Stored Communications Act. However, in the Appellate Division's decision affirming the judgment of petitioner's conviction, the Appellate Division declined to review petitioner's Stored Communications Act claim, stating that it was unpreserved for appellate review, citing to N.Y.C.P.L. § 470.05(2). *Rubin*, 39 N.Y.S.3d at 76. Essentially, this statute "grants an appellate court the discretion to decline to review claims if they were not preserved by being sufficiently presented to or decided by the trial court." *Ashley v. Burge,* No. 05 Civ. 4497(JGK), 2006 WL 3327589, at *4 (E.D.N.Y. Nov. 3, 2006); *see also People v. Medina,* 53 N.Y .2d 951, 952 (N.Y.1981). The Appellate Division's

statement that petitioner's claim was "unpreserved" is sufficient to establish that it was relying on a procedural bar as an independent ground in disposing of the issue. *See, e.g.*, *Figueroa v. Grenier*, No. 02–cv–5444 DAB GWG, 2005 WL 249001, at *8 (S.D.N.Y. Feb. 2, 2005). Additionally, New York's preservation doctrine is firmly established and regularly followed. *See Garvey v. Duncan,* 485 F.3d 709, 715-16 (2d Cir. 2007).

Furthermore, the Appellate Division's reliance on the preservation doctrine was not exorbitant in this case. As noted above, in *Lee,* the Supreme Court concluded that there is a limited category of "exceptional cases" in which the state appellate court applied a firmly-established and regularly-followed procedural ground in an "exorbitant" manner so that the application of the ground was inadequate, and a federal court was therefore not barred from reviewing that claim on the merits in a habeas appeal. 534 U.S. at 376. Although the Supreme Court did not set forth a test that must be followed to determine whether an application of a procedural ground was exorbitant, the Second Circuit concluded in *Cotto v. Herbert* that there were three factors that could be derived from *Lee* and should be considered as guideposts in the analysis. 331 F.3d 217, 240 (2d Cir.2003). These factors are: "(1) whether the alleged violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state case law indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had substantially complied with the rule given 'the realities of trial,' and, therefore, whether demanding perfect compliance with the rule would serve a legitimate government interest." *Id.*

In accordance with the *Cotto* factors, the Appellate Division in the instant case did not apply the preservation doctrine in an exorbitant manner. With respect to the first *Cotto* factor, this factor weighs against petitioner because, even assuming *arguendo* that petitioner had preserved the objection, as discussed below, this claim fails on the merits.

The second *Cotto* factor also weighs heavily against petitioner. New York courts have consistently held that a defendant must make specific arguments to the suppression courts regarding allegedly improperly obtained evidence in order to preserve those arguments for appellate review. *See, e.g., People v. John*, 27 N.Y.3d 294, 303 (2016) (claim regarding warrantless search of a gun box was unpreserved for appellate review because the specific argument was not made to the suppression court); *People v. Robinson*, 778 N.Y.S.2d 808, 809 (4th Dep't 2004) (where defendant failed to move to suppress evidence, a claim that the seizure was unconstitutional was unpreserved for appeal).

Finally, with respect to the third *Cotto* factor, petitioner failed to "substantially comply" with the preservation rule, and demanding full compliance does serve a legitimate government interest. Petitioner failed to move to suppress the relevant cell phone records either before or during the trial. Essentially, the trial judge was unable to assess whether the cell phone records were obtained in violation of petitioner's constitutional rights. Full compliance with the preservation rule is critical so that the trial judge has an opportunity to prevent any reversible error, and because New York "has an interest in the finality of criminal trials." *See Ashley,* 2006 WL 3327589 at *5-7. Considering all three *Cotto* factors, the Appellate Division's conclusion that petitioner's claim of

improperly admitted cell phone records was procedurally barred was not exorbitant. Thus, the Appellate Division's holding that petitioner's claim was unpreserved for appellate review represents an adequate and independent state law ground to deny habeas relief.

Notwithstanding petitioner's failure to preserve this claim, this Court may still consider it on the merits if petitioner can demonstrate either "cause and prejudice" for the procedural default or that failure to consider the claim will result in a miscarriage of justice, *i.e.,* that he is actually innocent of the crimes for which he was convicted. *See Coleman,* 501 U.S. at 748–51; *Murray,* 477 U.S. at 496. Petitioner has failed to demonstrate cause or prejudice. With respect to cause, petitioner makes no argument for why he did not move to suppress the cell phone records. Additionally, petitioner has not demonstrated that prejudice would occur because the record contains overwhelming evidence of petitioner's guilt, even without the cell phone records– namely, the combined effect of the testimony of the eyewitness to the incident, the testimony of petitioner's son who was communicating with petitioner prior to the incident, the testimony of law enforcement officers, and the physical evidence recovered including the mask, the shell casings, and bullets. Nonetheless, in an abundance of caution, the Court reviews petitioner's claim on the merits below.

B. Merits Analysis

Petitioner raises five grounds for habeas relief: (1) the prosecutor's explanation for exercising his peremptory strike to excuse a prospective juror was a pretext for discrimination and therefore violated petitioner's *Batson* rights; (2) the trial court improvidently exercised its discretion when it permitted improper technical testimony by

the prosecution's witness, a custodian of cell phone records; (3) petitioner's Fourth Amendment rights were violated when the prosecution introduced into evidence the petitioner's phone records and cell site information without having first obtained a warrant or court order to obtain these records; (4) the prosecution failed to prove petitioner was guilty of murder beyond a reasonable doubt and the verdict was against the weight of evidence; and (5) his sentence was harsh and excessive. None of these arguments provide grounds for habeas relief in the instant case.

### 1. *Batson* Violations

### a. Legal Standard

*Batson v. Kentucky*, 476 U.S. 79 (1986), set forth a three-step inquiry for determining whether a party has exercised peremptory challenges in a racially discriminatory manner. *Harris v. Kulhmann*, 346 F.3d 330, 343 (2d Cir. 2003) (citing *McKinney v. Artuz*, 326 F.3d 87, 97-98 (2d Cir. 2003)). First, the moving party, *i.e.*, the opponent of the peremptory challenge, must make out a prima facie case that the non-moving party's peremptory challenge was based on racial discrimination. *McKinney*, 326 F.3d at 97. Second, the non-moving party must come forward and assert a race-neutral explanation for the challenge. *Id.* at 98. Notably, "although a race-neutral reason is given, it need not be persuasive or even plausible" during the second step of this inquiry. *Id.* "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Third, the trial court must then decide "whether the moving party carried the burden of showing by a preponderance of the evidence that the peremptory challenge at issue was based on race." *McKinney*, 326 F.3d at 98.

"Throughout the *Batson* procedure, the burden of proving that a strike was exercised on an impermissible discriminatory ground remains with the movant." *Messiah v. Duncan*, 435 F.3d 186, 195 (2d Cir. 2006). Thus, "the third step of the *Batson* inquiry requires a trial judge to make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances." *Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir. 2000) (quoting *United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir. 1991)). "Ordinarily, at step three, 'the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.'" *Messiah*, 435 F.3d at 195 (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality)).

Often, the best indication of discriminatory intent "will be the demeanor of the attorney who exercises the challenge. In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (citation omitted). As a result, the trial court must evaluate not only whether the attorney's demeanor demonstrates discriminatory intent, but also whether the juror's demeanor can be said to have "credibly" demonstrated a valid reason for the strike of the juror. *Id.*

Because "these determinations of credibility and demeanor lie 'peculiarly within a trial judge's province,' reviewing courts generally must 'defer to [the trial court] in the absence of exceptional circumstances.'" *Id.* (quoting *Hernandez*, 500 U.S. at 365-66). Furthermore, even though "[r]easonable minds reviewing the

record might disagree about the prosecutor's credibility [regarding prospective jurors' demeanors], . . . on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). Thus, "[t]o secure habeas relief [under *Batson*] petitioner must demonstrate that a state court's finding of the absence of purposeful discrimination was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and that the corresponding factual determination was 'objectively unreasonable' in light of the record before the court." *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003).

b. Application

Petitioner claims that the "[t]he prosecutor's reason for exercising a peremptory challenge to excuse [the] prospective juror . . . were [sic] a pretext for discrimination," and thus was a *Batson* violation. (Pet. 6.) The Appellate Division held that "there is no basis to disturb the County Court's determination that the race-neutral explanation provided by the prosecutor for striking the prospective juror was not pretextual." *Rubin*, 39 N.Y.S.3d at 76.

The Court concludes that the state courts' determinations were not unreasonable applications of clearly established federal law. On the contrary, the trial court properly applied the *Batson* analysis with respect to the challenged juror. Though it was somewhat unclear whether defense counsel was even attempting to raise a *Batson* challenge, the trial court did consider the prosecutor's proffered race-neutral reasons for the peremptory strike of the prospective juror before concluding that there was no *Batson* violation.

Specifically, the prosecutor's proffered race-neutral reason for the strike involved Boozer's confusion with regard to questions asked during the jury selection process. Concern over a juror's confusing answers to voir dire questions is a valid reason for a prosecutor exercising a peremptory challenge. *See Galarza v. Keane*, 252 F.3d 630 (2d Cir. 2001).

In *Galarza*, the Second Circuit held that a juror's confusion can be the basis for a valid peremptory strike. There, the state prosecutor utilized a peremptory strike against one Hispanic juror because the prosecutor "thought she had a problem understanding." *Galarza*, 252 F.3d at 633. Additionally, the prosecutor used a peremptory strike against another juror because "[h]e seemed somewhat confused today when [the trial court judge] asked him point blank questions about certain things, he would say no, then he would go ahead and answer in the affirmative." *Id.* The Second Circuit found that the trial court did not err in accepting these reasons for striking the prospective juror, and therefore the *Batson* challenges over these two jurors were without merit. *Id.* at 639; *see also United States v. Hunter*, 86 F.3d 679, 683 (7th Cir. 1996) (concluding the government did not violate *Batson* when it exercised a peremptory challenge because of the juror's "confused answers to certain voir dire questions"); *Barbara v. Goord*, No. CV 98-4569 (RR), 2001 WL 1776159, at *6 (E.D.N.Y. Dec. 27, 2001) (crediting the prosecutor's reason regarding the juror's confusion and therefore rejecting petitioner's *Batson* challenge). Thus, under *Galarza*, a juror's confusion during voir dire questions is an acceptable reason to exercise a peremptory challenge.

Furthermore, in light of the heavy deference given to the trial court's determination, *Snyder*, 552 U.S. at 477, this Court concludes that the trial court judge's determination "of the absence of purposeful

discrimination" was not clearly erroneous. *Miller-El*, 537 U.S. at 348; *see also United States v. Biaggi*, 853 F.2d 89, 96 (2d Cir. 1988) ("Where the court itself has conducted the voir dire and thus was able to observe as well the demeanor of the prospective jurors, we believe the court's assessment of the prosecution's stated reasons for excusing jurors is entitled to special deference.").

Here, the prosecutor offered a race-neutral explanation for the strike, and defense counsel did not offer any explanation as to why the proffered reason was pretextual. Because the prosecutor's explanation for the strike was racially neutral, *see Galarza*, 252 F.3d 639, and the special deference afforded to the trial court's assessment of the prosecution's stated reasons for excusing jurors, *Biaggi*, 853 F.2d at 96, petitioner has not demonstrated that the "state court's finding of the absence of purposeful discrimination was incorrect by clear and convincing evidence . . . and that the corresponding factual determination was 'objectively unreasonable' in light of the record." *Miller-El*, 537 U.S. at 348. Accordingly, this Court finds that petitioner has failed to demonstrate that the denial of his *Batson* claim in state court involved an unreasonable application of federal law, or an unreasonable determination of the facts. Petitioner's *Batson* claims do not warrant relief.

2.  Introduction of Expert Testimony From a Lay Witness

a.  Legal Standard

It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir. 1983); *see Estelle v. McGuire,* 502 U.S. 62 (1991) ("[H]abeas corpus relief does not lie for errors of state law." (quoting *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990)). Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, the petitioner must "show that the error deprived [him] of a fundamentally fair trial." *Taylor,* 708 F.2d at 891; *see also Zarvela v. Artuz,* 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a *fundamentally fair* trial.'" (quoting *Rosario v. Kuhlman,* 839 F.2d 918, 925 (2d Cir. 1988))). In other words, "[t]he introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunningan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)), *abrogated on other grounds by Perry v. New Hampshire*, 565 U.S. 228 (2012).

To constitute a denial of due process under this standard, the erroneously admitted evidence must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan,* 137 F.3d at 125 (internal quotation marks omitted) (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (holding that evidence must be "crucial, critical, highly significant") (citation and internal quotation marks omitted)). Moreover, the court "must review the erroneously admitted evidence in light of the entire record before the jury." *Dunnigan,* 137 F.3d at 125 (citation and internal quotation marks omitted). In making this due process determination, the Court should engage in a two-part analysis, examining (1) whether the trial court's

evidentiary ruling was erroneous under New York State law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *See Wade v. Mantello,* 333 F.3d 51, 59 n.7 (2d Cir. 2003); *Davis v. Strack,* 270 F.3d 111, 123-24 (2d Cir. 2001). As set forth below, the Court has reviewed petitioner's objections regarding the testimony of the MetroPCS custodian of records under this two-part test, and concludes that it does not warrant habeas relief.

b. Application

Petitioner argues that the trial court improperly permitted a lay witness, Kenneth LeCesne, the custodian of records for MetroPCS (petitioner's cell carrier), to give "technical testimony." (Pet. 6.) Specifically, petitioner argues that LeCesne improperly was permitted to testify about the operation of cell towers and the location of petitioner's cell phone on the dates relevant to the underlying crime. (*Id.*)

As a general principle of evidence, a lay witness can only testify to facts based on his or her personal knowledge or experience. *Ferguson v. Hubbell*, 97 N.Y. 507, 512 (1884) ("The general rule of law is that witnesses must state facts within their knowledge, and not give their opinions or their inferences."). However, a witness may offer a lay opinion "when the subject matter of that testimony is such that it is impossible to accurately describe certain facts without including some opinion or impression." *People v. Dax*, 650 N.Y.S.2d 94, 95 (1st Dep't 1996); *see also People v. Russell*, 567 N.Y.S.2d 548, 553 (2d Dep't 1991), *aff'd.* 79 N.Y.2d 1024 (1992).

In this case, LeCesne testified about the general operations of cell phone towers, and then interpreted petitioner's cell phone records to identify the location of the phone throughout the relevant period. (T. 296-344.) In *People v. Paige*, the First Department held that a custodian of records, not qualified as an expert, properly testified "to matters within her knowledge and experience," when she testified as to the "probable location of defendant's phone at a time the particular call was made" based upon cell phone records and cell tower information. 891 N.Y.S.2d 374, 376 (1st Dep't 2009). On direct appeal in this case, the Second Department, relying on *Paige*, found that petitioner's challenge to LeCesne's testimony failed, because the "testimony, which was based on records showing the proximity of the phone to particular cell phone towers, was within the record custodian's knowledge and experience." *Rubin*, 39 N.Y.S.3d at 76.

The conclusions of the First and Second Departments are consistent with federal courts who have analyzed this issue. Federal courts have admitted lay witness testimony regarding cellular telephone communications with a cell tower and how the records stored from these communications tend to indicate the approximate location of the user's cell phone. *See United States v. Baker*, 496 F. App'x 201, 204 n.1 (3d Cir. 2012) (concluding that a custodian of records for a cell phone company could properly testify as to the operation of cell phone tower sites without being qualified as an expert where the testimony "consisted entirely of reading and interpreting [the defendant's] cell phone records, including records detailing the locations of cell phone towers used to carry out his phone calls"); *United States v. Kale*, 445 F. App'x 482, 485-86 (3d Cir. 2011) (finding that custodian of record's testimony concerning the operations of cell phone towers "did not require any scientific, technical, or other specialized knowledge," and was proper lay testimony); *United States v. Feliciano*, 300 F. App'x 795, 801 (11th Cir. 2008) (classifying law enforcement officer's testimony concerning defendant's

cell phone records, including the location of cell phone towers, and the defendant's cell phone location based on those cell tower records, as lay testimony based on personal knowledge and not an expert opinion); *United States v. Fama*, No. 12-CR-186 (WFK), 2012 WL 6102700, at *2 (E.D.N.Y. Dec. 10, 2012) (finding that such testimony is based on personal knowledge, and constitutes lay witness testimony); *United States v. Henderson,* No. 10–cr–117, 2011 WL 6016477, at *5 (N.D. Okla. Dec. 2, 2011) (admitting lay witness testimony regarding the probable location of defendant's cell phone based on cell phone and tower records).

Here, the Court concludes that the testimony elicited from LeCesne concerning the operations of cell phone towers did not implicate any scientific, technical, or other specialized knowledge, but rather was based upon LeCesne's own personal knowledge. LeCesne had been employed with MetroPCS since August 2011 (T. 297), had received eighty hours of training in order to testify accurately about cell phone and tower records from Metro PCS in their compliance unit (T. 298), has testified over 220 times on behalf of the company concerning such documents (T. 298-299), and has personal experience and knowledge dealing with MetroPCS's cell tower and cell site records (T. 299). Thus, the Court concludes that LeCesne's testimony regarding the general operations of cell phone towers and the location of petitioner's cell phone based on the cell site records was within the scope of his personal knowledge. Accordingly, this Court agrees with the Second Department that LeCesne's testimony was proper for a lay witness. Thus, the trial court's ruling was not erroneous under state or federal law.

Further, even assuming *arguendo* that the trial court erroneously permitted LeCesne to testify regarding the cell site records, in light of the overwhelming evidence of petitioner's guilt, specifically the combined effect of the testimony of the eyewitness to the incident, testimony of petitioner's son who was communicating with petitioner prior to the incident, testimony of law enforcement officers, and the physical evidence recovered including the mask, the shell casings, and bullets, the error would not have been so prejudicial as to deprive the petitioner of a fundamentally fair trial. *See Rosario*, 839 F.2d at 924.

### 3. Fourth Amendment Claim

Petitioner alleges that he is entitled to habeas relief because it was "a violation of [his] fourth amendment rights when the prosecution introduced into evidence, without having obtained a warrant or a court order, [his] cell phone records . . . ." (Pet. 8.) As discussed *supra*, the Court concludes that this claim is procedurally barred. However, in an abundance of caution, the Court reviews this claim on the merits, and concludes that this claim is entirely without merit.

#### a. Legal Standard

It is well-settled that "[w]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). The Second Circuit has further explained that under *Powell*:

> Review of fourth amendment claims in habeas petitions would be undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has

provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process.

*Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). Courts have described such a breakdown as occurring when the state court "failed to conduct a reasoned method of inquiry into relevant questions of fact and law." *Id.* at 71 (internal quotation marks and citations omitted).

b. Application

As to the first prong of the Fourth Amendment analysis, New York State has adequate corrective procedures for litigating Fourth Amendment claims, which are set forth in C.P.L. § 710.10 *et seq. See, e.g., Capellan*, 975 F.2d at 70 n.1 ("[T]he 'federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate.'" (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1998))); *McPhail v. Warden, Attica Corr. Facility*, 707 F.2d 67, 69 (2d Cir. 1983) (New York's procedure for litigating a Fourth Amendment claim in a criminal trial complied with requirement that state provide an opportunity to litigate such claims).

Accordingly, petitioner must show that an "unconscionable breakdown" occurred in New York State's statutory mechanism for reviewing Fourth Amendment claims. In *Cappellan*, the Second Circuit gave examples of "the sort of disruption or obstruction of a state proceeding typifying an unconscionable breakdown." 975 F.2d at 70 (internal quotation marks and citations omitted). The Second Circuit guided that an unconscionable breakdown might occur if the trial court "yielded to mob intimidation of the jury" or if "the process furnished was 'claimed to be meaningless [because] the totality of state procedures allegedly did not provide rational conditions for inquiring into federal-law ... questions.'" *Id.* (quoting Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus Review for State Prisoners*, 76 Harv. L. Rev. 441, 456-57 (1963)).

Here, there is no evidence of "'disruption or obstruction of [the] state proceeding' typifying an unconscionable breakdown." *Cappellan,* 975 F.2d at 70 (quoting *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)). The petitioner failed to avail himself of the New York State procedure, by failing to move to suppress the allegedly unconstitutionally obtained evidence. Therefore, he may not now raise this issue on federal habeas review.

In addition, contrary to petitioner's contentions, a court order was, in fact, issued to obtain petitioner's cell phone records pursuant to the Stored Communications Act, 18 USC § 2703(d). (*See* Resp. Opp., Ex. 25). Moreover, though petitioner does not raise it, the Court in an abundance of caution also has conducted an analysis pursuant to the recent decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), issued after the relevant proceedings in this case.

In *Carpenter*, the Supreme Court was faced with the question of "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." 130 S. Ct. at 2211. There, cell-site records were obtained over a period of 127 days of Carpenter's movements, and the records were obtained through an order pursuant to the Stored Communications Act, which required a showing by the government of "reasonable grounds" for believing that the records were "relevant and material to an ongoing investigation," which is a standard

lower than probable cause. *Id.* at 2217, 2221. Ultimately, the Court acknowledged that the information obtained through cell-site records "does not fit neatly under existing precedents," but determined that it was a search demanding Fourth Amendment protections and concluded that orders such as the one in *Carpenter* should be based on a finding of probable cause, not the lower standard utilized under Section 2703(d). *Id.* at 2210-11.

In *United States v. Zodhiates*, the Second Circuit acknowledged the *Carpenter* decision issued during the pendency of that appeal, but held that "when the Government "act[s] with an objectively reasonable good-faith belief that their conduct is lawful," the exclusionary rule does not apply. 901 F.3d 137, 143 (2d Cir. 2018). The prosecution in *Zodhiates* obtained cell phone records, which disclosed the general area of the defendant's phone's location, through a subpoena under the Stored Communications Act, instead of a warrant. *Id.* at 141. The defendant argued for suppression of those records because the higher showing of probable cause was not met. *Id.* at 143. The Court rejected the defendant's argument, finding that the government acted in good faith in relying on appellate precedent (existing at the time before the *Carpenter* decision) which stood for the proposition that a warrant was not required for cell phone records. *Id.* at 143-44; *see also United States v. Guillen*, No. 17-CR-512 (KMW), 2018 WL 5831318, at *15 (S.D.N.Y. Nov. 7, 2018) (finding that before *Carpenter*, the issuance of a cell-site order on only reasonable cause and not probable cause was "in compliance with a federal statute which was not clearly unconstitutional at the time [and] it was reasonable for law enforcement officers to rely on the order" (internal quotation marks and citations omitted)).

Pursuant to Second Circuit precedent pre-*Carpenter*, the prosecution was entitled to rely on the January 22, 2013 order signed by Justice Condon to obtain petitioner's cell phone records. The state court followed existing Supreme Court precedent at the time of the decision. Moreover, the January 22, 2013 order did not use the "reasonable grounds standard" but was actually based on a finding of "specific and articulable facts showing *probable cause*." (Resp. Opp., Ex. 25) (emphasis added.) Thus, *Carpenter*, which focused on court orders issued under a standard lower than probable cause, is inapplicable for this New York state court order issued based on probable cause. *See People v. Clark*, 97 N.Y.S.3d 711, 713 (2d Dep't 2019) ("In any event, the court order authorizing the acquisition of the records made an express finding of probable cause . . . [a]ccordingly, the order 'was effectively a warrant' which complied with the requirement of *Carpenter*."); *People v. Cutts*, 88 N.Y.S.3d 332 (N.Y. Sup. Ct. 2018) (finding that, because the state court order was based on probable cause, *Carpenter* did not apply).

For all the above reasons, the Court finds no Fourth Amendment violation.

### 4. Sufficiency of the Evidence Claim

Petitioner claims that the prosecution failed to prove petitioner's guilt to the charge of murder in the second degree beyond a reasonable doubt and that his conviction was against the weight of evidence. (Pet. 9.) It is well established that weight of the evidence and legal sufficiency are two distinct claims, each requiring a discrete analysis. *People v. Bleakley,* 69 N.Y.2d 490, 495 (1987). Thus, the Court will address each claim in turn.

### a. Legal Standard: Weight of the Evidence

In a weight of the evidence claim, "[e]ven if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further. If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, 'weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony.'" *Id.* (quoting *People ex rel. MacCracken v. Miller*, 291 N.Y. 55, 62 (1943)).

However, the law is clear that a "weight of the evidence" claim is based on state law. *See, e.g., Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles." (citations omitted)). The Court cannot consider a purely state law claim on federal habeas review. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law . . . ."). Further, as the Second Circuit has highlighted, "assessments of the weight of evidence or the credibility of the witnesses are for the jury and not grounds for reversal on appeal." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996). Therefore, to the extent petitioner raises a weight of the evidence claim under state law, the Court cannot review it.[5]

b. Legal Standard: Legal Sufficiency of the Evidence

However, this Court can review petitioner's legal sufficiency claim, and concludes that this claim is without merit.

On appeal, the Second Department held that "[v]iewing the evidence in the light most favorable to the prosecution . . . , we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. *Rubin*, 39 N.Y.S.3d at 76 (internal citations omitted). As set forth below, having carefully reviewed the record, this Court concludes that this determination by the state court regarding the sufficiency of the evidence was not contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented at trial.

The law governing habeas relief from a state conviction based on insufficiency of the evidence is well established. *See Einaugler v. Supreme Court of N.Y.,* 109 F.3d 836, 839 (2d Cir. 1997) ("The Due Process Clause of the Fourteenth Amendment prohibits conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'" (quoting *In re Winship*, 397 U.S. 358, 364 (1970))).

However, a petitioner "bears a very heavy burden," *Einaugler,* 109 F.3d at 840 (quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)), and a "state criminal conviction will be upheld if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

---

[5] The Court notes that the Second Department rejected this claim on the merits, holding that the verdict was not against the weight of the evidence. *Rubin*, 39 N.Y.S.3d at 76.

have found the essential elements of the crime beyond a reasonable doubt.'" *Vassell v. McGinnis,* No. 04-CV-0856(JG), 2004 WL 3088666, at *5 (E.D.N.Y. Dec. 22, 2004) (emphasis in original) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)); *see also Policano v. Herbert,* 507 F.3d 111, 115-16 (2d Cir. 2007) ("[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2554 [,] . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." (internal quotation marks omitted) (quoting *Jackson,* 443 U.S. at 324)).

Further, even when "faced with a record of historical facts that supports conflicting inferences, [this Court] must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson,* 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson,* 443 U.S. at 326). Thus, "[a] habeas court will not grant relief on a sufficiency claim unless the record is 'so totally devoid of evidentiary support that a due process issue is raised.'" *Sanford v. Burge,* 334 F. Supp. 2d 289, 303 (E.D.N.Y. 2004) (quoting *Bossett v. Walker,* 41 F.3d 825, 830 (2d Cir. 1994)).

When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir.1999). Accordingly, in this case, the Court looks to New York law for the elements of murder in the second degree. Under the relevant New York law, "[a] person is guilty of murder in the second degree when . . . [w]ith intent to cause the

death of another person, he causes the death of such person or of a third person." N.Y.P.L. § 125.25(a)(1).

c. Application

In the instant petition, petitioner seeks generally to challenge the legal sufficiency of the evidence, though petitioner fails to make any specific challenge. (Pet. 9.) For the reasons set forth below, the Court concludes that this ruling was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the entire record. Thus, this claim does not entitle petitioner to habeas relief.

The Court concludes that there was sufficient evidence at trial that would allow a rational trier of fact to conclude beyond a reasonable doubt that petitioner murdered Berry. As a non-exhaustive list, jurors were presented with the following evidence: (1) when Oyola called 911, she immediately identified the shooter as her husband, petitioner (T. 113-16); (2) Oyola recognized petitioner's voice and could see his eyes when he entered the trailer during the murder (T. 129); (3) Oyola witnessed petitioner shoot Berry from a distance of about four feet (T. 110), and then witnessed petitioner shoot the remaining shots from a distance of about two feet (T. 210); (4) the murder occurred immediately after petitioner learned from his son that Berry was at Oyola's residence (T. 82); (5) cell phone records indicated that J. spoke to petitioner that night, followed by petitioner calling Oyola's phone using *67 to block his phone number (T. 337, 338); (6) Berry died from five gunshot wounds to the torso as described by expert witness testimony (T.2 20); (7) the five bullets removed from Berry's body were all .38 caliber (T. 464) ; (8) police recovered from petitioner's bedroom two .38 shell casings

and a .357 Winchester cartridge (T. 371, 373); (9) a .357 revolver could shoot the .38 caliber bullets which killed Berry and could also shoot the type of ammunition found in petitioner's apartment, as described by expert testimony (T. 470, T. 425); (10) the dark mask worn by the shooter that was found on the street where Oyola saw petitioner flee was similar to ones petitioner wore when he rode his quad (T. 84-85, 187, 190); and (11) records from petitioner's cell phone provider and cell towers placed petitioner's cell phone in an area less than one mile from Oyola's residence right before the crime occurred around 4:30 a.m. (T. 410, 411). Additionally, the Court notes that the intent requirement for a conviction of murder in the second degree under New York law is satisfied by the evidence that petitioner shot Berry multiple times at close range. *See People v. Bell*, 844 N.Y.S.2d 407, 408 (2nd Dep't 2007) (finding that shooting the victim twice at close range is enough to satisfy intent); *People v. Hogan*, 631 N.Y.S.2d 405, 405 (2nd Dep't 1995) ("The defendant's intent to cause the death of another person (*see* Penal Law §125.25 [1]), is manifest in his act of repeatedly shooting at the witnesses at close range.") (citing *People v. Horton*, 18 N.Y.2d 355, 359 (N.Y. 1966))).

Thus, the Court concludes that, based upon the testimony and evidence presented to the jury, petitioner's claim that his conviction is legally insufficient is meritless.

### 5. Harsh and Excessive Sentence

As noted above, petitioner was sentenced to twenty years' to life imprisonment on the crime of murder in the second degree. Petitioner now contends that the sentence imposed by the trial court of twenty years to life is harsh and excessive. (Pet. 16).

### a. Legal Standard

When a petitioner claims that his sentence is harsh and excessive, for purpose of habeas review, "[n]o federal constitutional issue is presented [if] . . . the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *see also Alfini v. Lord*, 245 F. Supp. 2d 493, 502 (E.D.N.Y. 2003) ("It is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law."); *McCalvin v. Senkowski*, 160 F. Supp. 2d 586, 589 (S.D.N.Y. 2001) ("Sentencing decisions are not cognizable on habeas corpus review unless the sentence imposed falls outside the range prescribed by state law."); *Thomas v. Senkowski*, 968 F. Supp. 953, 956 (S.D.N.Y. 1997) (dismissing excessive sentence claim where petitioner's sentence fell within the statutorily prescribed range.).

### b. Application

On appeal, the Appellate Division concluded that petitioner's sentence was neither harsh nor excessive. *Rubin*, 39 N.Y.S.3d at 76. For the reasons discussed below, this Court concludes that the Appellate Division's holding was not contrary to, nor an unreasonable application of, clearly established federal law.

The Court concludes that petitioner's sentence was within the permissible range prescribed by New York state law, and thus there is no federal question for habeas review. *See White*, 969 F.2d at 1383. Here, petitioner was found guilty of murder in the second degree in New York. (Pet. 1). New York classifies murder in the second degree as a class "A-1" felony. *See* Penal Law §125.25. The sentencing range for a class A-1 felony under New York law is an

indeterminate term with a range of 15 years to life to 25 years to life. *See* Penal Law §70.00. In petitioner's case, the trial court sentenced petitioner to 20 years to life, which falls within the statutorily prescribed range. Therefore, petitioner's harsh and excessive claim does not raise a federal constitutional issue.[6] *See Nash v. Green Haven Corr. Facility*, No. 10-CV-003113 (JFB), 2014 WL 4165366, at *14 (E.D.N.Y. Aug. 12, 2014) (finding no federal question for habeas review concerning New York sentence of 25 years to life for murder in the second degree).

Accordingly, as petitioner's sentence falls within the statutorily prescribed range, there is no basis for habeas relief on these grounds.

## IV. CONCLUSION

For the reasons set forth above, the Court concludes that petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. Therefore, the petition for a writ of habeas corpus is denied in its entirety. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of the Court shall

enter judgment accordingly and close this case.

SO ORDERED.

JOSEPH F. BIANCO
United States Circuit Judge (sitting by designation)

Dated: August 5, 2019
Central Islip, New York

\* \* \*

Petitioner proceeds *pro se*. Respondent is represented by Timothy D. Sini, District Attorney of Suffolk County and Karla L. Lato, Assistant District Attorney, Suffolk County District Attorney's Office, 200 Center Drive, Riverhead, NY 11901

---

[6] To the extent petitioner claims that his sentence is cruel and unusual punishment under the Eighth Amendment, the Court rejects such a claim on this same basis. In any event, the Court finds no basis to conclude that petitioner's sentence of twenty years to life imprisonment is so grossly disproportionate to the crime committed so as to violate his Eighth Amendment rights given the nature of his criminal activity in this case.

22